2007 ME 41

STATE of Maine

v.

Eugene V. DOWNS Jr.

Supreme Judicial Court of Maine.

Argued: Sept. 19, 2006.

Decided: March 2, 2007.

Evert N. Fowle, DA, James G. Mitchell, ADA (orally), Skowhegan, for the State.

Jason M. Jabar, Esq., Arnold S. Clark, Esq. (orally), Jabar, Batten, Ringer & Murphy, Waterville, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

Majority: DANA, CALKINS, LEVY, and SILVER, JJ.

Dissent: SAUFLEY, C.J., and CLIFFORD, and ALEXANDER, JJ.

Dissent: ALEXANDER, J.

---

1. The counts are as currently codified: burglary of a residence, Class B, 17–A M.R.S. § 401 (2006) (16 counts); theft of a firearm, Class B, 17–A M.R.S. § 353 (2006) (2 counts); burglary of a motor vehicle, Class C, 17–A M.R.S. § 405 (2006) (1 count); burglary, Class C, 17–A M.R.S. § 401 (21 counts); theft, Class C, 17–A M.R.S. § 353 (9 counts); theft, Class D, 17–A M.R.S. § 353 (7 counts); and theft, Class E, 17–A M.R.S. § 353 (20 counts).

DANA, J.

[¶ 1] Eugene V. Downs Jr. appeals the sentence imposed by the Superior Court (Somerset County, *Mills, J.*), contending that the court erred (1) in applying the three-step sentencing analysis codified at 17–A M.R.S. § 1252–C (2006); (2) in imposing consecutive sentences; and (3) in finding that Downs has the ability to pay the imposed amount of restitution. We take this occasion to discuss how a court complies with the statute while sentencing a defendant who has been on a crime spree and conclude that the trial court erred in applying the first step of the sentencing analysis and remand for resentencing.

### I. CASE HISTORY

[¶ 2] Between September 2002 and January 2004, Downs, on thirty-eight occasions, committed a burglary and theft. With one or two other individuals, Downs victimized unoccupied residences (seasonal camps) and businesses, including locations where he had previously worked. He victimized some locations multiple times. Downs's criminal activity was apparently fueled by, and served to maintain, his drug and alcohol use. Downs and the two accomplices were identified as a result of a law enforcement investigation. He subsequently confessed to his crimes and cooperated in the ongoing investigation.

[¶ 3] During the Rule 11 proceeding, Downs pleaded guilty to seventy-six counts of burglary and theft,[1] and the court reviewed the maximum sentences allowed under the law for Class B and C crimes and indicated the possibility of lesser sentences. There was no plea agreement.

[¶ 4] At sentencing, the court imposed:

- On Count 3 (Class B burglary), a sentence of ten years, all but six years suspended and four years probation;
- On Count 11 (Class B burglary), ten years, all suspended, and four years probation, consecutive to the sentence imposed on Count 3; and
- On Count 40 (Class B theft, theft of a firearm), ten years, all suspended and four years probation, consecutive to the sentence imposed on Count 11.[2]

[¶ 5] In sum, Downs, then twenty-five years old, was sentenced to an overall term of thirty years, all but six suspended, and twelve years probation. As one of the conditions of probation, Downs was ordered to pay restitution of $57,173.66 within the first eleven years of his probationary period. Downs had no prior criminal record. He attended high school through the eleventh grade and had a sporadic work history.

## II. DISCUSSION

[¶ 6] We have not previously opined on the appropriate sentencing analysis when the defendant is convicted of multiple crimes resulting from what appears to be a crime spree. Nor has the Legislature enacted any statutes relating to the sentencing analysis for crime sprees. The Legislature has mandated the process to be employed generally for sentencing, which is found at 17–A M.R.S. § 1252–C and is known as the *Hewey* analysis. *See State v. Hewey*, 622 A.2d 1151 (Me.1993). We conclude that the three-step *Hewey* analysis is the process to be followed whether the court is sentencing a defendant for a single offense, several offenses or, as here, for

multiple crimes as part of a crime spree. In the first step of the sentencing analysis, the court determines a basic period of incarceration "by considering the particular nature and seriousness of the offense as committed by the offender." 17–A M.R.S. § 1252–C(1); *Hewey*, 622 A.2d at 1154 (stating this "determination is made *solely* by reference to the offender's *criminal conduct* in committing the crime, that is, 'by considering the particular nature and seriousness of the offense without regard to the circumstances of the offender.' ").

[¶ 7] "In evaluating the nature and seriousness of the offense we place the criminal conduct on a continuum for each type of offense to determine which act justifies the imposition of the most extreme punishment." *State v. Corbett*, 618 A.2d 222, 224 (Me.1992) (internal quotations omitted); *State v. Berube*, 1997 ME 165, ¶ 3, 698 A.2d 509, 511 ("[T]he court is to measure the defendant's conduct 'on a scale of seriousness against all possible means of committing the crime in order to determine which acts deserve the most punishment.' "). We review the sentencing court's determination of the basic period of incarceration for misapplication of principle. *Hewey*, 622 A.2d at 1155.

[¶ 8] The maximum sentences that may be imposed for a Class B offense and a Class C offense are ten years and five years respectively. 17–A M.R.S. § 1252(2)(B), (C) (2006). The basic sentences imposed on Downs for the Class B (Counts 3, 11, and 40) and Class C offenses were the maximum sentences available.

---

2. On the remaining Class B counts, the court sentenced Downs to six years, to be served concurrently with Count 3. On the Class C counts, the court sentenced him to five years, concurrent with the sentence on Count 3, all but two years suspended and two years probation. On the Class D counts, the court sentenced Downs to nine months, concurrent with the sentence imposed on Count 3. On the Class E offenses, the court sentenced him to five months, concurrent with the sentence on Count 3.

[¶ 9] At the first step of the sentencing analysis, the court stated:

> Based on the *Hewey* analysis, and also the statutory analysis under 1252–C, the basic period of incarceration in this case, no question about it in my mind on the Class B offenses, is ten years, just based on—... I understand the argument—and I'll get to this in a moment—about no prior record, but he made basically a career for sixteen months out of ... committing criminal offenses, ... it's almost disingenuous to say he had no prior record when this sheer amount of criminal activity went on for this amount of time.
>
> I'm also considering the number of burglaries, the period of time that this took place, that he burglarized places that apparently he had been employed in in the past, that he burglarized places more than one time.... So, when you come to court on seventy-six counts involving burglaries, thefts, it's—I think it's a serious matter, and it's for the reasons I just stated I'd put the basic period of incarceration at ten years on the Class B's.

[¶ 10] The court acknowledged that the Class B burglaries resulted from the burglary of unoccupied seasonal camps, but concluded that such camps are nonetheless residences, stating that:

> The fact that the people, fortunately, were not there when these burglaries took place, I expect is something that these defendants thought about and knew that they could probably get away with it because these places aren't occupied .... I expect its part of the modus operandi, so to speak, of these defendants.

■ [¶ 11] Although the court provided its reasoning in imposing the maximum basic sentence for the Class B offenses, the court failed to consider the manner in which Downs committed the Class B burglaries and thefts, or the Class C offenses,[3] on a scale of seriousness against all possible means of committing the crimes. *See, e.g., Corbett*, 618 A.2d at 224 (determining that, in the hierarchy of drug trafficking, the crime and the manner in which it was committed by the defendant, a street runner selling small amounts of drugs, did not justify the court's imposition of the maximum basic sentence). We do not minimize the seriousness of Downs's crimes. Nonetheless, we find that the nature and seriousness of Downs's Class B burglary and theft offenses (Counts 3, 11, and 40, the counts selected by the court as controlling sentences) do not justify the imposition of the maximum basic sentence. When placed on a continuum of means by which burglary and theft crimes can be committed, the fact that Downs did not, for instance, use the threat of force against individuals and that he intentionally chose to burglarize residences and workplaces only at times when individuals or families would not be confronted, indicates that these crimes must be considered less serious than the most serious ways of committing these offenses.

■ [¶ 12] The court also erred when it took into consideration the number of crimes committed when setting the basic sentences for individual Class B counts. The basic sentence for an offense is to be determined solely by considering the particular nature and seriousness of that specific offense as committed by the offender. 17–A M.R.S. § 1252–C(1). In a case involving multiple offenses of the same class,

---

**3.** The court noted with respect to the Class C offenses only that the three-step sentencing analysis is "essentially the same" except that the maximum sentence for a Class C offense is five years.

such as this, it would be appropriate, as occurred in this case, for the court to choose a representative or primary offense for analysis in the first step of the *Hewey* process. Factors extrinsic to the particular nature and seriousness of the specific offense at issue, such as the number of other crimes committed, are generally not relevant considerations at this first step in the analysis, although it may be relevant if the fact that the crime is part of a multiplicity of offenses bears on the degree of planning undertaken to commit the crime. *See State v. Pfeil*, 1998 ME 245, ¶ 15, 720 A.2d 573, 577. The fact that an offender has committed multiple offenses is to be considered in the second step. It is an aggravating factor, and as with other aggravating and mitigating factors, it is relevant in the analysis of the second step. It is in the second *Hewey* step that the court can increase the basic sentence because of the number of other offenses.

[¶ 13] Here, the sentencing court did not treat the fact that Downs had committed numerous offenses as bearing on the degree of planning he undertook to commit one of his burglaries or thefts, but instead considered the numerous offenses as es-

tablishing that each was so serious as to support the longest possible sentence, ten years, as the basic sentence for the representative Class B offenses. We find, therefore, that the sentencing court misapplied principle in the first step of the sentencing analysis by failing to analyze properly the particular nature and seriousness of the offense being sentenced and by considering other crimes when determining the basic sentence for a particular crime.

■ [¶ 14] Because we vacate Downs's entire sentence and remand for resentencing, we do not decide: (1) whether the final sentence is excessive;[4] (2) whether Downs met his burden of demonstrating that he was not capable of paying the amount of restitution imposed by the court; (3) the other challenges to the court's application of the *Hewey* analysis; and (4) whether 17–A M.R.S. § 1256(2) (2006) authorizes a sentencing court to employ numerous consecutive sentences as a device for creating a probation period long enough for a defendant to pay an otherwise impossibly large amount of restitution.[5]

---

4. When the court resentences the defendant, it should avoid a technical error committed in the original sentencing. A court may not sentence a defendant to consecutive sentences for crimes arising out of the same criminal episode when one crime consists only of preparation to commit, or facilitation of, the other crime. 17–A M.R.S. § 1256(3)(B) (2006). We review the legality of a sentence de novo. *State v. Soucy*, 2006 ME 8, ¶ 11, 890 A.2d 719, 723.

In this case, Count 39 (burglary, Class C) occurred in the same criminal episode as Count 40 (theft of a firearm, Class B). Pursuant to section 1256(3)(B), sentences imposed on these two counts cannot be consecutive because the burglary offense of Count 39 was committed in order to facilitate the theft offense of Count 40. In effect, however, the sentence imposed on Count 40 was imposed consecutively with the sentence imposed on

Count 39 rather than concurrently. This technical error also occurred with respect to the sentences imposed on Counts 11 and 12.

5. The sentencing court appeared to indicate that one of its reasons for imposing a lengthy period of probation was to give Downs time to pay the ordered restitution:

I'm going to also impose consecutive sentences. The State recommends it, the statute permits it .... These offenses are for offenses based on different criminal conduct, different episodes in terms of different dates for sixteen months, and, also, subsection D, for ... serious criminal conduct involved I think allows me to impose consecutive sentences, and I'm going to do that also to ensure that restitution is made to the extent Mr. Downs has the ability to do that within the period of time he has on probation.

The entry is:

Sentence vacated and remanded for re-sentencing.

SAUFLEY, C.J., with whom CLIFFORD and ALEXANDER, JJ., join, dissenting.

[¶ 15] I must respectfully dissent.

[¶ 16] In my opinion, the Court errs in its legal analysis by (1) assuming that the court in *State v. Hewey*, 622 A.2d 1151, 1154–55 (Me.1993), and the Legislature in its later codification of *Hewey*, both intended to apply *Hewey's* individual crime, tripartite analysis to the sentencing of multiple offenses committed in a crime spree; and (2) ignoring our prior case law, in which we have specifically approved the aggregated sentencing approach employed by the sentencing judge in this case. In so doing, the Court invalidates a practice that has been an effective and reasonable part of sentencing in Maine for years. Accordingly, I cannot join the Court's opinion.

[¶ 17] I would hold that, when facing the prospect of sentencing a single individual for a substantial series of crimes, a judge has two options. First, the judge may, as the majority today urges, apply to each individual offense the specific three-step process announced in *Hewey*, 622 A.2d at 1154–55, and codified at 17–A M.R.S. § 1252–C (2006). Second, the judge may use the aggregated sentencing approach applied by the sentencing judge in this case. Accordingly, I do not disagree with the Court that the *Hewey* analysis could be applied to each crime separately,[6] but I part with the Court in its disapproval of the second option because it is not required by law, and because we have already approved and acknowledged the use of the aggregated approach in case law that is equally applicable to this case.

[¶ 18] Beginning with the application of the statute, the codification of the *Hewey* analysis found at 17–A M.R.S. § 1252–C simply does not contemplate the circumstances in which the sentencing judge found herself in this case. Section 1252–C requires a three-part analysis for each "offense." Downs was charged with seventy-six separate offenses. The very prospect of having a sentencing judge undertake the required articulation of the three-part analysis for each of the seventy-six counts would complicate and obfuscate the sentencing process. The Court today attempts to solve that problem by admitting the possibility that the sentencing judge may, in essence, bypass section 1252–C for many of the offenses once it has undertaken that three-part analysis for a few representative offenses. In my view, this approach is a tacit recognition that the *Hewey* section 1252–C analysis simply does not work for crime spree sentencing. Thus, I would conclude that the application of section 1252–C to the offenses at bar is not mandated by law.

[¶ 19] The same conclusion is reached through a review of our prior decisions. We have said that, when setting the basic sentence, a sentencing judge may consider that the defendant committed multiple offenses: "The multiplicity of the offenses is not an impermissible factor." *State v. Pfeil*, 1998 ME 245, ¶ 15, 720 A.2d 573, 577. We have also regularly acknowledged the overall efficacy of an aggregated approach. *See State v. Brown*, 1998 ME 129, ¶¶ 4, 11–12, 712 A.2d 513, 515, 517 (affirming fifty-nine-year sentence that in-

---

6. Although I would be concerned that a rigid application of the *Hewey* analysis to seventy-six separate crimes, as in this case, might inappropriately consume the court's time and resources or lead to disrespect for the sentencing process, these concerns are not for this day.

cluded consecutive terms for eight of the thirty-three convicted offenses); *State v. Cloutier*, 646 A.2d 358, 362 (Me.1994) (stating that a sentencing judge may consider the seriousness of conduct involved in multiple criminal episodes when determining whether to impose a sentence exceeding the maximum sentence available for the most serious offense); *cf. State v. Frechette*, 645 A.2d 1128, 1129–30 (Me.1994) (holding that the sentencing judge properly applied sentencing principles for each sentence but failed to observe that the total sentence was excessive).

[¶ 20] By approving an aggregated approach for sentencing an offender who has gone on a crime spree, or committed multiple crimes, we have afforded judges options that enable them to reach sentences that serve the statutory purposes of sentencing. *See* 17–A M.R.S. § 1151 (2006). According to the statutorily defined purposes of sentencing, a sentence should adequately provide for the rehabilitation of the offender, while also deterring crime and restraining the offender to the extent necessary. *Id.* § 1151(1). It should take into account the gravity of the offense, *see id.* § 1151(8), but should not be overly harsh on the sole basis that multiple offenses resulted from a defendant's course of conduct, *see id.* § 1151(3), (6). A sentence should "minimize correctional experiences which serve to promote further criminality," and "encourage restitution in ... cases in which the victim can be compensated." *Id.* § 1151(2), (3). In reaching a sentence, a judge must differentiate among offenders and justly individualize sentences. *Id.* § 1151(6).

[¶ 21] If a defendant must be sentenced individually on each crime committed in a crime spree, the resulting sentence may in some circumstances run afoul of the statutory purposes of sentencing. *See id.* § 1151. A very long sentence resulting

from the sheer number of offenses could increase an offender's period of incarceration and maximize, rather than minimize, correctional experiences that may promote further criminality. *See id.* § 1151(3). Such a sentence might also decrease the likelihood that an offender will be able to rehabilitate and pay restitution. *See id.* § 1151(1), (2).

[¶ 22] By contrast, a sentence might minimize the gravity of an offender's conduct if each of the offenses, taken alone, warrants only a mild sentence. *See id.* § 1151(8). A sentencing judge should be permitted to consider the broader course of criminal conduct in determining a sentence that provides for adequate restraint of the offender and deters future criminal conduct. *See id.* § 1151(1).

[¶ 23] As other state courts have acknowledged, a judge may reach an appropriate final sentence by taking into consideration the broader course of the defendant's criminal conduct when determining the sentence for each of the multiple convictions resulting from a crime spree. For instance, the Connecticut Supreme Court acknowledged that a judge sentencing on multiple offenses often crafts the sentences based on an overall plan, imposing individual sentences "merely as component parts or building blocks of a larger total punishment for the aggregate convictions." *State v. Miranda*, 260 Conn. 93, 794 A.2d 506, 528, *cert. denied*, 537 U.S. 902, 123 S.Ct. 224, 154 L.Ed.2d 175 (2002). The Court of Appeal of California noted that, "[a]t some point a judge *should* evaluate the sentence in the aggregate.... Surely, a judge should not hand down a term believed to be excessive in the aggregate simply because a mechanistic micro-examination of the counts without regard to each other will yield such a term." *Peo-*

*ple v. Calderon,* 20 Cal.App.4th 82, 26 Cal.Rptr.2d 31, 34 (1993).

[¶ 24] Consistent with this reasoning, a judge sentencing an offender for multiple convictions resulting from a crime spree should have the discretion either to apply the strict three-part *Hewey* analysis to each individual offense, *or* to use the aggregated sentencing approach that we have previously approved. A sentencing judge who has both options is better able to enter a sentence that prevents crime through deterrence, rehabilitation, and restraint of offenders; encourages the payment of restitution; minimizes correctional experiences that promote further criminality; communicates to the broader community the type of sentence that may be imposed upon conviction of an offense; eliminates inequalities in sentences that are unrelated to legitimate criminological goals; encourages differentiation to promote just, individualized sentences; and acknowledges the gravity of the offense. *Id.* § 1151(1)-(6), (8).

[¶ 25] Because I believe that judges must have the option of aggregated sentencing when determining what sentence will best serve the statutory purposes of sentencing, and because we have approved an aggregated sentencing approach in the past, I would affirm the sentence imposed in the matter before us.

ALEXANDER, J., dissenting.

[¶ 26] I respectfully dissent. The Court's opinion today confounds long-standing, well-accepted, and often utilized trial court practice for sentencing individuals convicted, at one time, of multiple, serious felonies. In so doing, the Court applies an "ends justifies the means" approach to its sentence review authority to alter a sentence it dislikes, without regard to how the words of its opinion may affect real world application of laws intended to punish serious criminals.

[¶ 27] To justify its novel interpretation of Maine law, the Court first declares: "We have not previously opined on the appropriate sentencing analysis when the defendant is convicted of multiple crimes resulting from what appears to be a crime spree." That declaration is mistaken.

[¶ 28] In *State v. Pfeil,* 1998 ME 245, ¶ 12, 720 A.2d 573, 577, the defendant, like Downs, had no prior criminal record. He engaged in a sex crime spree, molesting three young children over an extended period of time. *Id.* ¶¶ 9–11, 720 A.2d at 577. Ultimately, he was charged with twenty-five counts of gross sexual assault, unlawful sexual contact and assault. *Id.* ¶ 2, 720 A.2d at 575. He pleaded guilty to three gross sexual assaults, four unlawful sexual contacts, and two assaults. *Id.* Using consecutive sentencing, the trial court sentenced Pfeil to fifteen years in prison with all but seven years suspended and ten years probation. *Id.* ¶ 4, 720 A.2d at 576.

[¶ 29] In appealing his sentence, Pfeil argued that, "the court impermissibly considered the fact that there were multiple offenses" in determining the basic period of incarceration for the individual offenses pursuant to the *Hewey* analysis. *Id.* ¶¶ 14–15, 720 A.2d at 577. We rejected that claim, holding that "[t]he multiplicity of the offenses is not an impermissible factor" to consider in the first stage of sentencing for individual offenses. *Id.* Thus, contrary to the Court's opinion, we have "opined on" and approved such consideration of multiple offenses or crime sprees in sentencing for individual offenses. Today's opinion overrules *Pfeil's* approval of such consideration in the first stage of sentencing for individual offenses.

[¶ 30] We have also approved consideration of multiple offenses in sentencing for individual offenses in several other opin-

ions. In *State v. Brown*, 1998 ME 129, 712 A.2d 513, we affirmed a fifty-nine-year sentence for a crime spree that involved nineteen separate criminal episodes over a seven-month period. The crimes included burglaries of three homes, eleven businesses, and five churches. *Id.* ¶ 2, 712 A.2d at 515. Brown was convicted of eighteen counts of burglary, eleven counts of Class B, C, and E theft, and four counts of robbery arising from confrontations with individuals during the burglaries. *Id.* ¶¶ 1, 4, 712 A.2d at 514–15.

[¶ 31] To achieve its sentence of fifty-nine years, the court imposed consecutive terms of imprisonment in eight of the thirty-three counts in the indictment and concurrent terms on the rest. *Id.* ¶ 4, 712 A.2d at 515. The sentencing practice approved in *Brown* was identical to the practice employed in this case: consecutive, high sentencing on a few counts to achieve the overall sentencing objective and then concurrent sentences on the majority of the counts. *Id.* ¶ 12, 712 A.2d at 517. But the *Brown* sentence was different. For half the number of criminal episodes, Brown received an underlying sentence double the underlying sentence in this case, and an actual time to be served ten times higher than the time to be served in this case. Thus, we have previously "opined on" and approved the sentencing practice employed in this case. We also have addressed consideration of multiple felonies in sentencing for individual crimes in three other cases discussed later in this opinion. *See State v. Sweet*, 2000 ME 14, ¶¶ 4–8, 745 A.2d 368, 374 (sentencing for many charged and uncharged felony sex crimes); *State v. Cloutier*, 646 A.2d 358, 359, 362 (Me.1994) (sentencing for six separate arsons); *State v. Frechette*, 645 A.2d 1128, 1129–30 (Me.1994) (sentencing for eight separate felony sex crimes).

[¶ 32] Following its mistaken declaration that we have not "opined on" crime spree sentencing, the Court declares "[n]or has the Legislature enacted any statutes relating to the sentencing analysis for crime sprees." This declaration is also mistaken. It suggests that the Legislature, in enacting the Criminal Code, and in the thirty-two years since, never considered that more than one crime might be before the Court for sentencing at any one time.

[¶ 33] The Legislature has addressed sentencing for multiple crimes, or crime sprees, in 17-A M.R.S. § 1256(2)(A) (2006), stating that a court may consider concurrent or consecutive sentencing where "the convictions are for offenses based on different conduct or arising from different criminal episodes." Crime spree sentencing is also addressed in 17-A M.R.S. § 1256(2)(D) (2006), where the Legislature has directed the court to consider in sentencing "[t]hat the seriousness of the criminal conduct involved in either a single criminal episode *or in multiple criminal episodes* or the seriousness of the criminal record of the convicted person, or both, require a sentence of imprisonment in excess of the maximum available for the most serious offense" (emphasis added). These laws, enacted by our Legislature, authorize the sentencing practice approved in *Pfeil* and *Brown* and employed by the trial court in this case.

[¶ 34] The Court's reasoning is also flawed in suggesting, albeit incorrectly, that since the Legislature has not acted, the Court should usurp the legislative function and impose its own guidelines upon sentencing for multiple felonies. The Court may not like the Maine Legislature's decision to leave to the trial courts a broad range of choice in sentencing, but that is no excuse for limiting the trial courts' choices and overturning trial court

sentencing that respects the Legislature's intent.

[¶ 35] The Court's approach, ignoring statute and precedent, is highlighted by the assumption that, no matter how many crimes have been committed—here it is seventy-six—sentencing analyses must begin by considering the nature of each crime in a vacuum, one crime at a time. The Court's opinion holds that the trial court "erred when it took into consideration the number of crimes committed when setting the basic sentences for individual Class B counts," and that "[t]he basic sentence for an offense is to be determined solely by considering the particular nature and seriousness of that specific offense committed by the offender." This proposition, that has absolutely no support in Maine law, mandates a dramatic change in practice for crime spree sentencing that has prevailed since the adoption of the Criminal Code. In effect, the Court is legislating a new sentencing regime.

[¶ 36] The Court defies common sense in holding that the court, evaluating the nature and seriousness of one crime, must ignore the defendant's seventy-five related crimes that are before the court for sentencing.[7] The Court also seems unclear as to how the trial court erred. At one point the Court suggests that if the trial court considers planning for multiple offenses, it can consider the multiple offenses at the first stage of the sentencing process. At another point, the Court suggests that the trial court erred only in considering Downs's multiple felonies at the first stage, rather than the second stage, of the so-called *Hewey* analysis. If that is the case,

if the trial court would have acted correctly had it mentioned planning, or had it mentioned the multiple felonies just a few sentences later in its sentencing analysis, then any error is harmless. M.R.Crim. P. 52(a).

[¶ 37] Like any other trial court error, perceived errors in sentencing are subject to harmless error review. *Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992); *State v. Burdick*, 2001 ME 143, ¶¶ 11, 34, 782 A.2d 319, 323, 329; *United States v. Teague*, 469 F.3d 205, 210 (1st Cir.2006). A sentencing error is harmless if "the error did not affect the [trial] court's selection of the sentence imposed." *Williams*, 503 U.S. at 203, 112 S.Ct. 1112; *United States v. Roselli*, 366 F.3d 58, 65 (1st Cir.2004) (quotation marks omitted). Considering Downs's multiple felonies one sentencing stage later, or considering his planning for his crime spree, would certainly have led to the same sentences. The fact that the Court does not invoke harmless error analysis indicates that it has more fundamental objections than are articulated in its opinion to the sentencing for these seventy-six crimes.

[¶ 38] Downs received an overall sentence of thirty years, with all but six years suspended, and twelve years probation. That sentence must be evaluated in the context of Downs's overall criminal activity: sixteen Class B burglaries of residences, twenty-two Class C burglaries, a total of thirty-eight burglaries, and thirty-eight thefts, each separately planned and executed over a period of eighteen months.

---

**7.** The absence of logic in the Court's holding is particularly evident when one contemplates how it might be applied to the sentencing of a serial pedophile convicted of committing many separate sex crimes, victimizing several different children. No judge with an ounce of compassion for the victims or concern for public safety could announce that he or she was beginning the pedophile's sentencing by considering each crime in isolation, as if the other crimes did not happen. Unfortunately, the Court's ruling, applied to a serial burglar and thief today, will apply equally to sentencing of serial pedophiles.

Because each of the burglary/thefts was a separate, serious felony arising from a separate criminal episode, the court could have imposed consecutive sentences for each criminal event pursuant to 17–A M.R.S. § 1256(2)(A).

[¶ 39] Had consecutive sentencing been applied, the maximum sentence for Downs's burglaries could have been 270 years. Downs's underlying sentence, thirty years, is only 1/9 of the maximum. His actual time to be served, six years, is only 1/45 of the maximum. His average underlying sentence, approximately nine months for each of his thirty-eight burglary convictions, is lower than the sentence most burglars would likely receive if their sentences were considered one at a time.[8]

[¶ 40] In practice, of course, trial courts do not and should not employ repetitive, consecutive sentencing when sentencing for a large number of crimes in a single sentencing proceeding. Instead, accepted trial court practice, until today, has (i) considered the crimes as a group; (ii) determined the overall sentence desired to be achieved; (iii) selected a few of the more serious crimes; (iv) imposed maximum or near maximum and consecutive sentences on those few to achieve the overall sentencing objective; and then (v) imposed lower, concurrent sentences for most of the crimes being sentenced. The trial court here followed that accepted sentencing practice. *See Pfeil,* 1998 ME 245, ¶¶ 9–19, 720 A.2d at 577–78; *Brown,* 1998 ME 129, ¶¶ 11–12, 712 A.2d at 517; *see also Sweet,* 2000 ME 14, ¶¶ 19–21, 745 A.2d at 374 (affirming use of consecutive, maximum sentences for selected primary crimes to achieve proper sentence in case involving many charged and uncharged felony sex crimes against children).

[¶ 41] Although the Court announces that in applying accepted sentencing practice the trial court "misapplied principle," neither our past precedents, nor available sentencing studies, support the one-crime-at-a-time sentencing principle that the Court imposes today. The only comprehensive study we have of Superior Court sentencing practices was published in 2001, reviewing sentencing for crimes charged in fiscal year 1997 and sentenced by August 30, 1999.[9] That study reviewed sentencing for 438 Class B burglaries that were committed in fiscal year 1997.[10] As in *Brown,* burglary sentencing often involves sentencing for multiple offenses, particularly other burglaries and thefts. Not surprisingly, the sentencing study indicates that in 224 instances, a Class B burglary was sentenced as a primary offense that received the highest sentence in cases where multiple offenses were sentenced simultaneously.[11] Many of these primary, highest sentences necessarily considered other pending charges in setting the primary sentence to achieve the overall sentencing objective. If the numbers reported in the

---

**8.** A comprehensive study of Superior Court sentences for crimes committed in fiscal year 1997 indicates that the average underlying sentence for a single offense, Class B burglary was 42.15 months, that 90% of such sentences were eight months or more, and that 75% of such sentences were eighteen months or more. The average underlying sentence for the primary Class B burglary when multiple offenses were sentenced simultaneously was thirty-eight months, with 90% of such sentences twelve months or more, and 75% of such sentences eighteen months or more.

The Hon. Howard H. Dana Jr. & the Hon. Leigh I. Saufley, Sentencing Statistics for All Crimes Charged in Fiscal Year 1997 in All Superior Courts in the State of Maine 4 (2001). This is the only comprehensive study of Maine Superior Court sentencing statistics.

**9.** *See supra* n. 8.

**10.** *Id.* at 4.

**11.** *Id.*

study are representative, then trial courts have employed the sentencing practice that is vacated today more than 1000 times since 1999.[12] Such a well-accepted, responsibly employed practice cannot be a "misapplication of principle."

[¶ 42] In the instances where *Hewey* analyses have been applied to sentencing for multiple criminal episodes, the Court's opinions have suggested that the sentencing court can consider the multiple crimes in setting the sentence for a primary crime that will achieve the court's overall sentencing objectives. *See Pfeil,* 1998 ME 245, ¶¶ 14–15, 720 A.2d at 577.

[¶ 43] In *Cloutier,* 646 A.2d at 359–60, the defendant was sentenced after pleas to six arsons involving a vacant apartment building, an unoccupied residence, three barns, and a telephone pole, each committed in a separate episode and five occurring in one night.[13] The Law Court vacated the sentence because it found (i) the restitution ordered, over $126,000, was excessive; (ii) the forty-year sentences, although contemplated by a plea agreement, were barred by the *Hewey* doctrine which, as applied by the Law Court, prohibited sentences over twenty years for crimes that did not involve injury to persons; and (iii) the total of the underlying sentences, eighty years, was excessive. *Id.* at 360–62.

[¶ 44] Addressing possible sentences on remand, the *Cloutier* Court stated that consideration of the multiple arsons could justify the sentencing court "in concluding that the basic period [of] incarceration, at least for some of the arsons committed on [the five arson night], should be at or near

twenty years." 646 A.2d at 361. Notably, in its remand, the Court used the term "should" not "could," effectively promoting a twenty-year basic sentence considering the multiple offenses. *Id.* The Court went on to state that "[a]lthough we vacate the sentences, we note that, albeit in a different manner, the court could have imposed penalties against Cloutier equal or nearly equal to the penalties set out in the plea agreement . . . ." 646 A.2d at 362.[14]

[¶ 45] In *Frechette,* 645 A.2d at 1129–30, the Law Court addressed sentencing for eight separate felony sex crimes, including four gross sexual assaults, committed upon a seven-year-old girl. The trial court sentenced Frechette to consecutive, maximum twenty-year sentences on each of the gross sexual assaults.[15] *Id.* at 1129. The primary sentence was twenty years, with all but eight years suspended, and six years probation. *Id.* The other three consecutive sentences were each twenty years, all suspended, and six years probation. *Id.* The other four charges resulted in sentences of five years each, the maximum, to be served concurrently with the eight-year incarceration on the first charge. *Id.* The resulting overall sentence was eighty years, with eight years incarceration and twenty-four years probation. *Id.*

[¶ 46] The sentencing pattern in *Frechette* was very similar to the sentencing pattern in the instant case: the incarceration objective for all crimes achieved by sentencing for one primary crime, the probation objective achieved by consecutive sentencing for several other crimes, and

---

12. This just considers the practice when applied to a primary sentence that is for a Class B burglary in a multiple offense sentencing case.

13. The arson of the vacant apartment building occurred on a different date.

14. A co-defendant's case was addressed adopting the reasoning from *Cloutier. See State v. Lajoie,* 651 A.2d 326, 327 (Me.1994).

15. Most of the crimes at issue were committed when the maximum sentence for gross sexual assault was twenty years.

the remainder of the crimes resolved by incarceration concurrent with the sentence on the primary crime. Addressing a mis-application of principle challenge to Frechette's sentencing, the Law Court held that "the court correctly approached its sentencing in this case, and some consecutive sentences are statutorily authorized." 645 A.2d at 1129. However, it determined that the four consecutive maximum sentences, totaling eighty years, when "considered in combination" were excessive. *Id.* The same could be said here if the trial court had imposed consecutive maximum sentences on each of the thirty-eight burglary charges.

[¶ 47] In *Frechette*, the Law Court was concerned with the combination of consecutive maximum sentences. It expressly approved the primary sentence on the first count, a maximum sentence with eight years to serve, followed by a maximum period of probation. That sentence necessarily considered the multiplicity of crimes committed and provided all of the actual incarceration. The court directed a reduction of only some of the suspended incarceration to reduce Frechette's eighty-year sentencing exposure. That exposure was 100% of the maximum sentences on the principal crimes committed. Downs's exposure in this case was only 11% of the maximum sentences on the principal crimes committed.

[¶ 48] *Sweet, Pfeil, Brown, Cloutier,* and *Frechette* all approved consideration of multiple crimes in a sentencing for individual primary crimes. The one-crime-at-a-time sentencing regime imposed by the Court today ignores legislative history, trial court practice, and the Court's own precedent, to utilize its sentence review authority to overturn a sentence it deems too long.[16]

[¶ 49] To achieve overall sentencing objectives under the new regime mandated by the Court today, trial courts will be required to impose many more separate, lower consecutive sentences on individual counts in indictments to achieve terms of incarceration and probation that are appropriate punishment for committing multiple felonies.[17] This one-crime-at-a-time sentencing practice will promote great confusion in sentencing, a veritable blizzard of paperwork and docketing for judges, court clerks, and corrections officials to sort through, and a magnified risk of entry and transmission errors in criminal history records.

[¶ 50] The sentences in this case should be affirmed. They were imposed pursuant to what were, until today, accepted and widely employed sentencing practices for multiple offense cases. They were not illegal or excessive.[18]

---

16. In addition to setting aside current practice and precedent, the Court's opinion poses an interesting analytical dilemma for sentencing considerations that include both charged and uncharged crimes. The Court holds that the trial court erred "by considering other crimes" in determining its basic sentence. The Court has long held that sentencing courts may consider reliable evidence of other uncharged crimes. *State v. Rosa,* 575 A.2d 727, 730–31 (Me.1990); *State v. Dumont,* 507 A.2d 164, 166–67 (Me.1986); *State v. O'Donnell,* 495 A.2d 798, 803 (Me.1985). If, as the Court holds today, the sentencing court cannot consider, in setting a primary sentence, other charged crimes also before the court for sentencing, how should a court consider uncharged crimes?

17. The imposition of consecutive sentences to achieve a similar overall sentence is not an available option on remand of this case. The Court held in *State v. Shackelford,* 672 A.2d 1097, 1098–99 (Me.1996), that when a trial court originally imposes concurrent sentences, it cannot upon a remand for resentencing, change some of the concurrent sentences to consecutive sentences in order to achieve an appropriate sentence.

---

**18.** Even if there were error in the trial court's discussion of its sentencing approach, that error, resulting in a sentence 1/9 of the possible maximum sentence and an average sentence consistent with single offense burglary sentencing, was harmless.